## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

| | | |
|---|---|---|
| STANLEY MOSLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. CV419-216 |
| | ) | |
| CERES MARINE TERMINALS, INC., | ) | |
| | ) | |
| Intervenor, | ) | |
| | ) | |
| HAI FENG 1710 DESIGNATED and | ) | |
| HAPAG-LLOYD AG, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## O R D E R

Before the Court is Defendants Hai Feng 1710 Designated and
Hapag-Lloyd AG's ("Defendants") Motion for Summary Judgment (Doc.
43), which Plaintiff Stanley Mosley has opposed (Doc. 55). For the
following reasons, Defendants' motion (Doc. 43) is **GRANTED.**

## BACKGROUND[1]

This case arises from an injury Plaintiff Stanley Mosley ("Mosley") sustained while working as a longshoreman aboard the M/V VIENNA EXPRESS (the "Vessel"). (Doc. 1, Attach. 3 at 7-8.) On April 19, 2019, the Vessel called at the Port of Savannah to load and discharge containerized cargo. (Doc. 45 at ¶ 1; Doc. 56 at ¶ 1.) At all times relevant to this case, the Vessel was owned by Defendant Hai Feng 1710 Designated and operated, captained, and crewed by Defendant Hapag-Lloyd AG. (Doc. 1, Attach. 3 at 8; Doc. 9 at 4.)

At the time of the incident, Mosley was employed by Intervenor Ceres Marine Terminals, Inc. ("Ceres"), a stevedoring company with operations in the Port of Savannah. (Doc. 45 at ¶ 1; Doc. 56 at ¶ 1.) Ceres hired Mosley, a member of the International Longshoreman's Association Local 1414 with six years of experience, to assist with the lashing and unlashing of containers

---

[1]  The relevant facts are taken principally from the Defendants' Statement of Material Facts (Doc. 45) and Mosley's response thereto (Doc. 56). Pursuant to Federal Rule of Civil Procedure 56(e) and Southern District of Georgia Local Rule 56.1, all material facts not controverted by specific citation to the record are deemed admitted unless otherwise inappropriate. Where the parties offer conflicting accounts of the events in question, this Court draws all inferences and reviews all evidence in the light most favorable to Mosley. See Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1318 (11th Cir. 2012) (quoting Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011)).

onboard the Vessel. (Doc. 45 at ¶ 1; Doc. 56 at ¶ 1; Doc. 53, Attach. 1 at 21.)

On the night of April 19, 2019, Mosley and Mark Norris, his lashing partner, began their cargo lashing operations at approximately 8:36 p.m. (Doc. 45 at ¶ 1; Doc. 56 at ¶ 1.) Mosley testified at his deposition that a nearby crane provided adequate illumination for the area. (Doc. 53, Attach. 1 at 18.) Mosley and Norris completed their lashing work approximately two hours later. (Doc. 45 at ¶ 1; Doc. 56 at ¶ 1.) Around 11:35 p.m., before their 11:45 p.m. lunch break, a Vessel crew member approached Mosley and Norris and indicated that there was a potential issue with the container lashings on the top level of the lashing bridge adjacent to one of the bays that Mosley and Norris had worked earlier.[2] (Doc. 45 at ¶ 2; Doc. 56 at ¶ 2.) Mosley and Norris requested that the crew member show them the issue. (Doc. 45 at ¶ 3; Doc. 56 at ¶ 3.) Mosley and Norris also asked the crew member to bring a flashlight, which he did. (Doc. 45 at ¶¶ 3-4; Doc. 56 at ¶¶ 3-4.) The crew member then led Mosley and Norris to the subject lashing bridge. (Doc. 45 at ¶ 4; Doc. 56 at ¶ 4.)

To reach the highest level of the lashing bridge, Mosley, Norris, and the crew member climbed two ladders. (Doc. 45 at ¶¶ 4, 6; Doc. 56 at ¶¶ 4, 6.) The first ladder went from the weather

---

[2] The crew member has not been identified. (Doc. 53, Attach. 1 at 6.)

deck to the second level, and the second ladder went from the second level to the uppermost third level of the lashing bridge. (Doc. 45 at ¶ 4; Doc. 56 at ¶ 4.) Mosley testified at his deposition that lighting levels appeared adequate at the first and second levels. (Doc. 53, Attach. 1 at 12.) After ascending through the manhole to reach the third level of the lashing bridge, Mosley and Norris closed the manhole cover behind them.[3] (Doc. 45 at ¶ 6; Doc. 56 at ¶ 6.) Mosley later explained that closing the manhole cover was "mandatory," remarking that he had "heard too many horror stories[.]" (Doc. 53, Attach. 1 at 8.) At this time, Mosley found the third level of the lashing bridge was "pitch black." (Id. at 11.) Since cargo operations had moved elsewhere, no crane lights illuminated the area, and no light source was affixed to the edge of the bridge.[4] (Id. at 10-11.) Upon recognizing the lighting issue, Mosley believed it was "too late" to go back down the ladder and retrieve a flashlight. (Id. at 12.) Mosley could, however, see things at a short distance, up to "a body length in front of [him]." (Id.)

---

[3] As the parties have done in their briefs, the Court will refer to the opening providing access between levels of the lashing bridge as the "manhole" and the apparatus that serves as a cover to the aforementioned opening as the "manhole cover."

[4] The Court notes that the lashing bridge on this level did not have a ceiling or any covering above it. (Doc. 45 at ¶ 6; Doc. 56 at ¶ 6.)

Despite the lack of lighting, Mosley and Norris followed the crew member to the offshore side and the containers with potential lashing issues, which Mosley and Norris confirmed were properly secured. (Doc. 45 at ¶¶ 6, 8; Doc. 56 at ¶¶ 6, 8.) Apparently satisfied with the lashing, the crew member responded that everything was "okay." (Doc. 45 at ¶ 8; Doc. 56 at ¶ 8.) Although the crew member was satisfied, Mosley proceeded to check the inshore lashing. (Doc. 53, Attach. 1 at 7.)

At some point, the crew member walked back to the manhole and climbed down, leaving the manhole cover open.[5] (Doc. 45 at ¶¶ 8, 10; Doc. 56 at ¶¶ 8, 10.) Norris saw the crew member descend through the manhole, but Mosley did not. (Doc. 45 at ¶ 9; Doc. 56 at ¶ 9; Doc. 44, Attach. 9 at ¶ 9; Doc. 53, Attach. 1 at 10.) When Mosley was walking back from the inshore side of the bridge, he was looking at Norris, and he fell through the open manhole. (Doc. 53, Attach. 1 at 7, 10; Doc. 44, Attach. 3 at 16-17.)   Mosley

---

[5] It is unclear whether the crew member descended from the lashing bridge before or after Mosley left to check the inshore lashing and whether he had to step over the manhole to reach those containers. Mosley stated that the crew member and Norris stayed where they were on the lashing bridge while he went to check the other side. (Doc. 53, Attach. 1 at 14, 15-16.) Norris, however, testified that he saw Mosley step over the open manhole to check the other side, suggesting that the crew member had already descended the lashing bridge and left the manhole cover open when Mosley went to check the other side. (Doc. 45 at ¶ 12; Doc. 56 at ¶ 12; Doc. 44, Attach. 3 at 16-17.) Ultimately, neither fact is determinative, but the Court construes these reasonable inferences in Mosley's favor.

suffered substantial injuries from the fall. (Doc. 1, Attach. 3 at 8.)

Mosley does not recall notifying the crew member that the walkway was dark, and he did not request additional lighting prior to his fall. (Doc. 53, Attach. 1 at 28; Doc. 45 at ¶ 13; Doc. 56 at ¶ 13.) A Ceres Safety Alert advises employees to "watch out for manhole openings" and "never assume others have closed the covers." (Doc. 45 at ¶ 14; Doc. 56 at ¶ 14; Doc. 44, Attach. 12 at 2.)

On July 2, 2019, Mosley brought this action in the State Court of Chatham County, Georgia, seeking recovery for the injuries he sustained while working on the Vessel. (Doc. 1, Attach. 3 at 6-12.) In his complaint, Mosley alleges Defendants were negligent because they failed to provide adequate lighting on the lashing bridge, failed to ensure that the manhole cover was closed, and failed to warn Mosley of the open manhole.[6] (Id. at 9.) On August

---

[6] In his complaint, Mosley also alleges Defendants were negligent by: (1) failing to maintain, inspect, and replace damaged, defective, or unsuitable vessel equipment; (2) employing incompetent officers, crew, and maintenance personnel responsible for maintaining, inspecting, and replacing damaged, defective, or unsuitable vessel equipment; and (3) failing to properly train officers and crew in maintaining, inspecting, and replacing damaged, defective, or unsuitable vessel equipment. (Doc. 1, Attach. 3 at 10.) In his response to Defendants' motion for summary judgment, however, Mosley makes no argument regarding crew member employment or training and only one limited reference to a "defect that injured" him. (Doc. 55 at 13.) Notwithstanding this limited reference, Mosley's claims do not appear to arise from theories that the lights or manhole cover were "defective," meaning that they failed to function properly. Accordingly, the Court will not address Mosley's allegations of negligence based on defective

6

28, 2019, Defendants removed the case to this Court.[7] (Doc. 1 at 1.) Now, Defendants have filed a motion for summary judgment, arguing that they did not breach any duty owed to Mosley under Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156, 101 S. Ct. 1614, 68 L. Ed. 2d 1 (1981). (Doc. 44 at 2.)

## STANDARD OF REVIEW

According to Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Such a motion must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial[.]' " Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (quoting Fed. R. Civ. P. 56(e) advisory committee's note to 1963 amendment). Summary judgment is appropriate when the

---

equipment or negligent hiring, training, or retention. See Edmondson v. Bd. of Trs. of the Univ. of Ala., 258 F. App'x 250, 253 (11th Cir. 2007) (per curiam) ("[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." (quoting Resol. Tr. Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995))).

[7] On April 27, 2020, Ceres Marine Terminals, Inc., intervened for reimbursement of compensation that it has paid Mosley under the Longshore and Harbor Workers' Compensation Act. (Doc. 23.)

nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The substantive law governing the action determines whether a fact is material. DeLong Equip. Co. v. Wash. Mills Abrasive Co., 887 F.2d 1499, 1505 (11th Cir. 1989) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986)).

As the Supreme Court explained:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Celotex, 477 U.S. at 323, 106 S. Ct. at 2553 (internal quotation marks omitted). The burden then shifts to the nonmoving party to establish, by going beyond the pleadings, that there is a genuine issue concerning facts material to its case. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The Court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmoving party. Matsushita, 475 U.S. at 587-88, 106 S. Ct. at 1356 (quoting United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 994, 8 L. Ed. 2d 176 (1962)). However, the nonmoving party "must do more

than simply show that there is some metaphysical doubt as to the material facts." Id. at 586, 106 S. Ct. at 1356 (citations omitted). A mere "scintilla" of evidence or simply conclusory allegations will not suffice. See, e.g., Tidwell v. Carter Prods., 135 F.3d 1422, 1425 (11th Cir. 1998) (citing Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989)). Nevertheless, where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989) (citing Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988)).

**ANALYSIS**

I.  LIABILITY UNDER THE LONGSHORE AND HARBOR WORKERS' COMPENSATION ACT

Mosley's complaint does not specifically invoke the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §§ 901-950. (Doc. 1, Attach. 3.) However, Mosley concedes in his response that this case is governed by § 905(b) of the LHWCA. (Doc. 55 at 4.) See Washington v. Nat'l Shipping Co. of Saudi Arabia, 374 F. Supp. 3d 1339, 1344 (S.D. Ga. 2019) (explaining the case was undisputedly governed by the LHWCA since it was premised upon injuries the plaintiff suffered while working on the defendant's foreign-flag vessel), aff'd on other grounds, 836 F. App'x 846 (11th Cir. 2020). Section 905(b) of the LHWCA authorizes suits by

9

longshoremen injured due to the negligence of a shipowner or charterer. The Supreme Court, however, has significantly narrowed the duties a shipowner or charterer owes to longshoremen under the LHWCA. See Scindia, 451 U.S. at 164-72, 101 S. Ct. at 1620-25. These duties, now known as the Scindia duties, include (1) the turnover duty, (2) the active control duty, and (3) the duty to intervene. Howlett v. Birkdale Shipping Co., S.A., 512 U.S. 92, 98, 114 S. Ct. 2057, 2063, 129 L. Ed. 2d 78 (1994). In opposing summary judgment, Mosley argues a jury must decide whether Defendants violated each of the three Scindia duties. (Doc. 55 at 7, 11-13.) The Court will evaluate the parties' arguments in turn.

A.    Turnover Duty

"A shipowner's turnover duty consists of two corresponding duties." Troutman v. Seaboard Atl. Ltd., 958 F.3d 1143, 1146 (11th Cir. 2020). The first is the turnover duty of safe condition, which requires that

> [a] vessel must exercise ordinary care under the circumstances to turn over the ship and its equipment and appliances in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care to carry on cargo operations with reasonable safety to persons and property.

Howlett, 512 U.S. at 98, 114 S. Ct. at 2063 (internal quotation marks omitted) (first citing Fed. Marine Terminals, Inc. v. Burnside Shipping Co., 394 U.S. 404, 416-17 n.18, 89 S. Ct. 1144,

1151 n.18, 22 L. Ed. 2d 371 (1969); and then citing <u>Scindia</u>, 451 U.S. at 167, 101 S. Ct. at 1622). As a corollary to the duty of safe condition, a vessel must also

> warn the stevedore of any hazards on the ship or with respect to its equipment, so long as the hazards are known to the vessel or should be known to it in the exercise of reasonable care, and would likely be encountered by the stevedore in the course of his cargo operations, are not known by the stevedore, and would not be obvious to or anticipated by him if reasonably competent in the performance of his work.

<u>Id.</u> at 98-99, 114 S. Ct. at 2063 (internal quotation marks omitted) (citing <u>Scindia</u>, 451 U.S. at 167, 101 S. Ct. at 1622).

Critically, both "[t]he turnover duty [of safe condition] and the turnover duty to warn relate to the condition of the ship upon commencement of stevedoring operations." <u>Chapman v. Bizet Shipping, S.A.</u>, 936 F. Supp. 982, 985 (S.D. Ga. 1996) (citing <u>Howlett</u>, 512 U.S. at 98, 114 S. Ct. at 2063). Meaning, "a breach of the turnover duty must occur at the moment of turnover." <u>Wilkinson v. FA Vinnen & Co.</u>, No. CV419-112, 2021 WL 1085333, at *7 (S.D. Ga. Mar. 18, 2021) (first quoting <u>Washington</u>, 374 F. Supp. 3d at 1354; and then citing <u>Howlett</u>, 512 U.S. at 98, 114 S. Ct. at 2063); <u>see also</u> <u>Davis v. Portline Transportes Mar. Internacional</u>, 16 F.3d 532, 537 (3d Cir. 1994) ("The turnover duty/duty to warn applies only at the moment the vessel initially turns control of the ship over to the stevedore[.]" (citing <u>Kirsch v. Plovidba</u>, 971 F.2d 1026, 1029 (3d Cir. 1992))).

In their motion, Defendants address Mosley's claim that darkness on the lashing bridge "was a hazardous condition upon turnover of the vessel." (Doc. 44 at 14.) Defendants primarily argue that their failure to light the lashing bridge was not a breach of the turnover duty because the duty to provide adequate lighting is imposed on the stevedore, in this case Ceres, and not vessel owners. (Id. at 14-16.) Defendants further contend that even if they were obligated to provide lighting, the open and obvious defense, applicable to both the turnover duty of safe condition and the turnover duty to warn, forecloses liability because darkness on the lashing bridge was an open and obvious hazard. (Id. at 16-19.) Finally, Defendants argue that Mosley, a reasonably competent longshoreman, could have anticipated and avoided the hazard. (Id. at 19-21.)

In response, Mosley alleges that Defendants breached the duty to turn over the Vessel in a reasonably safe condition by providing sub-standard lighting and by the crew member neglecting to close the manhole cover after he departed from the lashing bridge. (Doc. 55 at 7-9.) Mosley contends that his ability to avoid the inadequate lighting is a jury question because he was not aware of the hazard until it was too late. (Id. at 10-11.) Mosley also suggests that the Defendants failed to warn Mosley that the bridge was poorly lit or that the crew member left the manhole open when he descended from the lashing bridge. (Id. at 11-12.) As explained

12

below, the Court finds that these facts cannot establish a breach of the turnover duty.

Mosley's claim that Defendants breached their turnover duties by providing sub-standard lighting fails because "the duty to provide adequate lighting is imposed by law on the stevedore." Chapman, 936 F. Supp. at 986 (quoting Landsem v. Isuzu Motors, Ltd., 534 F. Supp. 448, 451 (D. Or. 1982), aff'd, 711 F.2d 1064 (9th Cir. 1983)); see also Dow v. Oldendorff Carriers GMBH & Co., 387 F. App'x 504, 506-07 (5th Cir. 2010) (per curiam) ("Even if the lighting were insufficient to continue work at that time of day, maintaining adequate lighting during cargo operations is the responsibility of the stevedore." (citations omitted)). As highlighted by Defendants, the LHWCA establishes that stevedores, the longshoremen's employer, are responsible for maintaining a reasonably safe place to work. (Doc. 44 at 15-16 (citing 33 U.S.C. § 941(a)); Scindia, 451 U.S. at 170, 101 S. Ct. at 1623. The Safety and Health Regulations for Longshoring set out the particulars of this obligation. See Scindia, 451 U.S. at 176, 101 S. Ct. at 1626-27 (citing 29 C.F.R. § 1918.1 et seq.). These regulations provide that the stevedore must ensure walking, working, and climbing areas are illuminated. 29 C.F.R. § 1918.92.[8] Accordingly, Mosley's

---

[8] None of Mosley's arguments in response address or establish an exception to statutory authority providing that it is the stevedore's obligation to ensure adequate lighting during cargo operations. First, Mosley points to the testimony of Wolfram

argument "that inadequate lighting of the Vessel created a hazardous condition" that breached either aspect of the turnover duty is "unavailing." <u>Wilkinson</u>, 2021 WL 1085333, at *6 n.8 (citing <u>Chapman</u>, 936 F. Supp. at 986).

Additionally, to the extent that Mosley contends that Defendants violated either aspect of the turnover duty when the crew member failed to close the manhole cover or warn Mosley that the manhole was open (Doc. 55 at 7-8, 12), these arguments also fail. The open manhole was not a hazardous condition at the time of turnover. The undisputed evidence reveals that the position of the manhole cover changed at least twice after the Vessel was turned over to the stevedore for cargo operations: (1) when Mosley and Norris closed the manhole cover behind them after ascending through the manhole and reaching the uppermost third level of the lashing bridge (Doc. 45 at ¶ 6; Doc. 56 at ¶ 6); and (2) when the crewmember opened the manhole cover as he departed the lashing bridge (Doc. 45 at ¶ 10; Doc. 56 at ¶ 10). Thus, no question exists that any potential hazard arising from the position of the manhole

---

Gunterman, Defendant's 30(b)(6) representative, who identified certain crew members responsible for ensuring the area was well-lit. (Doc. 55 at 7 (citing Doc. 55, Attach. 2 at 8).) Mosley also attempts to distinguish this case from <u>Purvis v. Ceres Marine Terminals, Inc.</u>, No. CV417-211, 2019 WL 1928498, at *3-6 (S.D. Ga. Apr. 30, 2019), <u>aff'd</u>, <u>Purvis v. Maersk Line A/S</u>, 795 F. App'x 756, 759 (11th Cir. 2020) (per curiam), and <u>Washington</u>, 374 F. Supp. 3d at 1356-57, cases in which district courts found no breach of the turnover duty. (Doc. 55 at 8, 11.)

cover was not created until the crew member left the manhole open while Mosley and Norris were on the lashing bridge, which occurred hours after the Vessel was turned over to the stevedore. Since either aspect of the turnover duty can only be violated at the moment a vessel is initially turned over, Davis, 16 F. 3d at 537, the turnover duty was not violated when the crew member left the lashing bridge without warning Mosley or Norris that he was leaving the manhole cover open. See Wilkinson, 2021 WL 1085333, at *7 (granting summary judgment on turnover duty of safe condition claim because the plaintiff had not provided any evidence that the hazardous substance was on the platform "at the time the Vessel Defendants turned the Vessel over to the stevedores"); see also Washington, 374 F. Supp. 3d at 1355 (evaluating whether the vessel defendants breached the turnover duty "at the moment [the defendant] turned over" the equipment that lacked safety chains). Because the evidence is clear that no hazardous condition existed at the time of turnover, the Court need not evaluate the open and obvious defense or determine whether the hazard could have been avoided by a reasonably competent stevedore.[9] Accordingly,

---

[9] In their briefs, both parties address the testimony of Mosley's expert, Richard Galuk. (Doc. 44 at 14; Doc. 55 at 9.) On August 27, 2021, this Court granted Defendants' Motion to Exclude Testimony of Richard Galuk and determined Mosley could not use Galuk's testimony relating to proper safety measures of a container vessel's crew or proper illumination of a lashing bridge. (Doc. 62 at 1, 11.) Accordingly, because "[e]vidence inadmissible at trial cannot be used to avoid summary judgment[,]" Galuk's testimony

Defendants are entitled to summary judgment with respect to Mosley's claim based on a breach of Defendants' turnover duties.

B.   Active Control Duty

Scindia also imposes the active control duty on vessel owners, which provides that once stevedoring operations are underway, a vessel

> may be liable if it [1] actively involves itself in the cargo operations and negligently injures a longshoreman or [2] if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation.

451 U.S. at 167, 101 S. Ct. at 1622. As this Court has recognized, to trigger the active control duty, a plaintiff must establish either that the vessel was "actively involved" in the operations in which the plaintiff was injured or that the vessel was in "active control of the [area] or any equipment" creating the hazardous condition. Miller v. Navalmar (UK) Ltd., No. CV413-239, 2016 WL 1322439, at *4, *4 n.8 (S.D. Ga. Mar. 31, 2016), aff'd, 685 F. App'x 751 (11th Cir. 2017) (per curiam); see also Washington, 374 F. Supp. 3d at 1357 ("[T]o state an active control duty claim, a plaintiff must show that the vessel owner 'substantially controlled or [was] in charge of (i) the area in

---

cannot be used to defeat summary judgment. Chapman v. Proctor & Gamble Distrib., LLC, 776 F.3d 1296, 1313 (11th Cir. 2014) (quoting Corwin v. Walt Disney Co., 475 F.3d 1239, 1249 (11th Cir. 2007)). In any event, expert testimony on these responsibilities ultimately is not dispositive.

which the hazard exist[ed], (ii) the instrumentality which caused the injury, or (iii) the specific activities the [harbor contractor] undertook.' " (quoting Ross v. United States, No. 3:10-CV-496-J-37-JBT, 2012 WL 523631, at *6 (M.D. Fla. Feb. 16, 2012))). If the vessel is actively involved in operations or actively controls the area, "the shipowner may be held liable if it has 'constructive knowledge' of a hazard." Green v. United States, 700 F. Supp. 2d 1280, 1297-98 (M.D. Fla. 2010) (quoting Lampkin v. Liber. Athene Transp. Co., 823 F.2d 1497, 1501 (11th Cir. 1987)) (calling duty applicable if shipowner actively involves itself in operations or actively controls the area or equipment the "active operations duty"), aff'd, 418 F. App'x 862 (11th Cir. 2011) (per curiam). If the active control duty is triggered, there is still a question of whether the defendant breached the active control duty. Ross, 2012 WL 523631, at *7-8.

Defendants argue they are entitled to summary judgment because the active control duty was never triggered. (Doc. 44 at 21.) Defendants point out that the area where Mosley was injured, the lashing bridge, had been turned over to the stevedoring company. (Id.) Moreover, Defendants maintain that no evidence exists that the crew member who accompanied Mosley to the lashing bridge exercised control over the "operational details of the lashing operation" or gave instruction for the "manner and method" of identifying and rectifying issues with the lashing work. (Id.

17

at 21-22.) Thus, Defendants argue they neither actively directed the lashing check nor actively controlled the lashing bridge. (Id.)

Mosley's primary argument for why the active control duty was violated appears to be that the lashing bridge area "remain[ed] under the active control of the vessel." (Doc. 55 at 12.) Although is not entirely clear whether Mosley is arguing that Defendants were actively involved in the lashing operations or actively controlled the lashing bridge, some of Mosley's allegations could arguably support an active involvement theory. The Court will therefore evaluate both arguments. Mosley's only arguments that Defendants were either actively involved the longshoremen's lashing operation or actively controlled the lashing bridge are that the Vessel's crew member approached Mosley and Norris concerning the lashing issue and that Mosley and Norris followed him to the lashing bridge after they told the crew member to show them the problem. (Doc. 45 at ¶¶ 2-3; Doc. 56 at ¶¶ 2-3.) Mosley also highlights that the crew member was carrying a flashlight at the time.[10] (Doc. 55 at 12.)

---

[10] The Court notes that Mosley has not clearly alleged Defendants actively controlled any apparatus that could arguably be classified as "equipment." Mosley makes no mention of the manhole cover in the active control section of his response. While Mosley refers to the crew member's flashlight, any argument that the Vessel retained active control over the ship's lighting equipment and thereby caused Mosley's injury is futile for the same reasons discussed in the section analyzing Mosley's turnover duty claim. E.g. Bias v. Hanjin Shipping Co., No. G-07-0338, 2009 WL 746051, at *5-6 (S.D. Tex. Mar. 18, 2009) (rejecting argument that lighting

Although Scindia "does not define active involvement in cargo operations, it makes clear that once control over the vessel is relinquished 'primary responsibility for the safety of the longshoremen lies with the stevedore.' " Miller, 685 F. App'x at 755 (first quoting Lampkin, 823 F.2d at 1501; and then citing Scindia, 451 U.S. at 170, 101 S. Ct. at 1623). To demonstrate active involvement in lashing operations, "the shipowner must [have] actually involve[d] itself in the operational details of [lashing], or otherwise directly control[led] the [lashing] efforts of involved longshoremen[,] effectively displacing the stevedore from its traditional control over [lashing] operations." Id. at 756.

The Court concludes that Defendants were not actively involved in lashing operations. Viewed in the light most favorable to Mosley, the record reveals that the crew member's involvement was limited to indicating a problem with the lashings on some containers, leading Mosley and Norris to the subject lashings, and being present while the men inspected the lashings. (Doc. 45 at ¶¶ 2, 4, 8; Doc. 56 at ¶¶ 2, 4, 8.) In Calderon v. Offen, a court in this Circuit noted the distinction between instructing longshoremen on how to perform cargo operations and "retain[ing] the ability to correct mistakes in lashing, since containers not

_____

equipment was under the active control of the vessel because it is the duty of the stevedore to provide lighting).

19

fully secured will come loose during transit." No. 07-61022-CIV, 2009 WL 3429771, at *4 (S.D. Fla. Oct. 20, 2009). In that case, longshoreman Miguel Calderon improperly stood on a hatch cover to adjust a mechanism with a lashing rod and fell. Id. at *1. The defendant's policies required ship officers to supervise lashing operations. Id. An assigned crew member had observed Calderon's dangerous actions and, without warning Calderon directly, reported them to his supervisor. Id. Although the crew member was actively supervising Calderon, the court found supervision over operations was insufficient to establish a vessel was actively involved in cargo operations without evidence that the vessel provided instructions on how to perform or participation in the work. Id. at *4. Otherwise, "injured stevedores would be entitled to a negligence trial in every instance [because] no shipowner or crew [can] ever completely disengage from some oversight of cargo operations." Id.

Employing similar reasoning, this Court has expressed that "a shipowner or charterer may have some degree of participation in cargo operations without becoming actively involved[]" because a shipowner may ultimately be liable for certain damaged cargo. Miller, 2016 WL 1322439, at *4. In this case, the crew member's involvement was limited to informing Mosley of a potential lashing problem and observing Mosley's work. These facts, by themselves, are not enough to show Defendants were actively involved in

20

Mosley's work. <u>Calderon</u>, 2009 WL 3429771, at *4 (finding no active involvement where "[t]here [was] no evidence . . . that the crew or officers of the [vessel] instructed Plaintiff or the stevedores how to perform cargo operations, nor did they participate in the cargo operations.").

The next question is whether Defendants failed to exercise reasonable care in an area remaining under their active control. "To determine whether an area is in the active control of the vessel owner, [courts] generally consider[] whether the area in question is within the contractor's work area and whether the work area has been 'turned over' to the contractor." <u>Fontenot v. McCall's Boat Rentals, Inc.</u>, 227 F. App'x 397, 403 (5th Cir. 2007) (citations omitted). Active control over an area is akin to being in "operational control at the time of the activities in question." <u>Id.</u> at 403-404. "Whether the vessel owner controls the methods and operative details of the stevedore's work" remains important for this aspect of the active control duty as well. <u>See, e.g.</u>, <u>Abston v. Jungerhaus Mar. Servs. GMBH & Co. KG</u>, 664 F. App'x 378, 381 (5th Cir. 2016) (per curiam) (citing <u>Dow</u>, 387 F. App'x at 507).

Here, no question exists that the lashing bridge where Mosley was injured was within the longshoremen's work area. The lashing bridge was adjacent to one of the bays Mosley and Norris had previously worked in the evening (Doc. 45 at ¶ 2; Doc. 56 at ¶ 2) and appears to have been on Norris's side of the bay (Doc. 53,

Attach. 1 at 6, 28). As discussed above, Defendants were not actively involved in the longshoremen's lashing operation, and the crew member had not given any instruction as to how Mosley and Norris should inspect the supposedly faulty lashing.

It is also undisputed the Vessel had been turned over. (Doc. 44 at 21; Doc. 53, Attach. 1 at 6.) Other than the crew member calling Mosley and Norris's attention to a potential problem with the lashing and leading them to it, Mosley points to no evidence that Defendants took any action indicating either that Defendants understood the stevedores had relinquished control or that Defendants had resumed control over the lashing bridge. Cf. Hodges v. Evisea Mar. Co., S.A., 801 F.2d 678, 683 (4th Cir. 1986) (noting that evidence existed that the ship's crew knew that the stevedores had completed loading in the hold at issue, the ship had closed the weather deck hatch, and the ship had turned off the lights when concluding that sufficient evidence of control over the area existed to create a jury issue).[11] Rather, Mosley emphasized that

---

[11] Although Mosley cited Hodges in his argument addressing the duty to intervene (Doc. 55 at 14), some district courts in the Fourth Circuit have indicated it provides insight into what constitutes active control or active involvement. Harris v. Pac.-Gulf Marine, Inc., 967 F. Supp. 158, 164 n.4 (E.D. Va. 1997) (explaining "[t]he [Circuit] Court determined there was sufficient evidence that the vessel was **in control of the area** of the accident to create a jury issue regarding the vessel's negligence" (emphasis added)). Also, a court in this District distinguished Hodges based on the active control duty, not the duty to intervene. Chapman, 936 F. Supp. at 986-87.

the longshoremen had to disembark the ship for a lunch break by 11:45 p.m. (Doc. 53, Attach. 1 at 6, 7.) In the Court's view, this testimony supports that, at 11:35 p.m. when the crew member indicated a problem with the lashing (Id. at 6), the lashing bridge was still under the stevedore's control. (Id. at 12.)

In cases where courts have found a vessel actively controlled the area, the vessel defendants exercised far greater oversight than was present in this case. Compare Ross, 2012 WL 523631, at *7 (explaining defendants exercised active control over the hatch and surrounding area because they restricted the hours that contractors could perform certain work, were actively involved in contractor's decisions, and required contractors to report to a crew member each time they opened or closed a hatch), with Cole v. Noble Drilling Corp., No. CIV 1:05CV479HSO-JMR, 2007 WL 2475944, at *12 (S.D. Miss. Aug. 28, 2007) (explaining active control duty was not automatically triggered even though defendant's employees had right to inspect and report unsafe conditions created by outside contractors), aff'd, 288 F. App'x 931 (5th Cir. 2008) (per curiam), and Dow, 387 F. App'x at 507 ("A vessel owner does not trigger a duty by having its employees check on the progress of the contractor's work." (citing Fontenot v. United States, 89 F.3d 205, 208 (5th Cir. 1996)).

The Court notes that several of the cases that Defendants cite rely, in part, on the absence of crew members in the area

when evaluating whether a vessel actively controlled an area. <u>Garry v. Exxon Mobil Corp.</u>, 150 F. App'x 363, 365 (5th Cir. 2005) (per curiam) (explaining that vessel owner employee left the area and did not return for two days after he instructed longshoreman regarding task and that no one else from vessel owner's company was in the room during the relevant time); <u>Wright v. Gulf Coast Dockside, Inc.</u>, No. Civ.A. 97-2745, 1998 WL 334851, at *2 (E.D. La. June 23, 1998) (noting "[n]o crew members accompanied the longshoremen into the hold[]" when concluding the area was not under the vessel's active control). Despite the presence of the crew member in this case, the Court nevertheless concludes, for the reasons discussed earlier, that the lashing bridge was not actively controlled by the Vessel at the time of Mosley's injury. <u>See</u> <u>Miller</u>, 685 F. App'x at 755 (explaining "simple presence of supervisory personnel during cargo operations [not] sufficient to constitute" active involvement (first quoting <u>Derr v. Kawasaki Kisen K.K.</u>, 835 F.2d 490, 494 (3d Cir. 1987); and then citing <u>Bonds v. Mortensen & Lange</u>, 717 F.2d 123, 127 n.4 (4th Cir. 1983))). To hold otherwise would contradict existing case law and expand the reach of the active control duty to any area in which a vessel employee is present, even if that employee had little involvement in the cargo operations. Because the evidence Mosley identifies fails to establish that Defendants were actively involved in lashing operations or actively controlled the lashing bridge where

Mosley was injured, the Court need not address whether a breach of the duty occurred. As a result, Defendants are entitled to summary judgment on Mosley's active control duty claim.

### C.   Duty to Intervene

The final duty potentially applicable to Mosley's claim is the duty to intervene. This duty provides that

> [w]here cargo operations have begun and the shipowner is not actively involved, [the shipowner] must have actual knowledge of the hazard before it may be held liable. In such a case, the shipowner has a duty to intervene to protect the longshoremen only if "it becomes aware that the ship or its gear poses a danger to the longshoremen and that the stevedore is failing, unreasonably, to protect the longshoremen . . . ."

Lampkin, 823 F.2d at 1501 (quoting Clark v. Bothelho Shipping Corp., 784 F.2d 1563, 1565 (11th Cir. 1986)); see also Roach v. M/V Aqua Grace, 857 F.2d 1575, 1581 (11th Cir. 1988) (citing Scindia, 451 U.S. at 178, 101 S. Ct. at 1627); Casaceli v. Martech Int'l, Inc., 774 F.2d 1322, 1330 (5th Cir. 1985) (explaining owners had a duty to intervene only if they knew the conditions presented a danger to the diver and that the diver himself was acting unreasonably). A shipowner owes no duty to intervene unless it has "actual knowledge of a dangerous condition and actual knowledge that the stevedore, in the exercise of 'obviously improvident' judgment, has failed to remedy it." Miller, 685 F. App'x at 757 (quoting Greenwood v. Societe Francaise De, 111 F.3d 1239, 1248 (5th Cir. 1997)).

25

Even if a defendant has actual knowledge of a condition, "[t]here is a distinction between knowledge of a condition and knowledge of the dangerousness of that condition[,]" and evidence must exist "that the defendants were actually aware that an unreasonable risk of harm was" created by the condition. Randolph v. Laeisz, 896 F.2d 964, 971 (5th Cir. 1990); see also Green, 418 F. App'x at 869 ("[K]nowledge that a condition . . . exists[] does not imply knowledge that the condition is dangerous." (alteration in original) (quoting Casaceli, 774 F.2d at 1330)). Moreover, actual knowledge of a dangerous condition is not dispositive; liability only attaches when the stevedore's decision to continue work in the face of the danger is "obviously improvident." Randolph, 896 F.2d at 971. Obvious improvidence "requires the stevedore to 'use an object with a defective condition that is so hazardous that anyone can tell that its continued use creates an unreasonable risk of harm even when the stevedore's expertise is taken into account[.]' " Miller, 685 F. App'x at 757 (quoting Greenwood, 111 F.3d at 1249). It follows then that "[t]he duty to intervene is an exceedingly narrow one and '[o]nly the most egregious decisions by the stevedore are "obviously improvident." ' " Id. (first citing Harris v. Pac.-Gulf Marine, Inc., 967 F. Supp. 158, 165 (E.D. Va. 1997); and then citing Greenwood, 111 F.3d at 1249).

26

In their motion for summary judgment, Defendants argue they did not violate the duty to intervene because they neither had knowledge of the stevedore's failure to provide adequate lighting nor notice that the stevedore would exercise improvident judgment and fail to remedy the hazardous situation. (Doc. 44 at 24, 25.) Defendants insist that "[w]here a stevedore has not even been given an opportunity to fix an allegedly hazardous situation, a shipowner cannot have knowledge of the stevedore's obviously improvident judgment not to remedy the situation." (Id. at 25.)

In response, Mosley argues that Defendants had a duty to correct the defect that injured him, but he fails to specify which "defect" Defendants should have corrected. (Doc. 55 at 13.) Mosley does state that "it was the crewmember who had a flashlight and apparently knew of the dark condition with no additional lighting." (Id.) Therefore, it appears that Mosley contends that Defendants had a duty to intervene regarding the allegedly inadequate lighting. Mosley cites Roach, an Eleventh Circuit case referencing the following Fifth Circuit factors, to show the duty to intervene arose:

> [W]hether the danger was open and obvious; whether the danger was located within the ship or ship's gear; which party created the danger or used the defective item and was therefore in a better position to correct it; which party owned or controlled the defective item; whether an affirmative act of negligence or acquiescence in the use of the dangerous item occurred; and whether the shipowner assumed any duty with regard to the dangerous item.

857 F.2d at 1582 (quoting <u>Casaceli</u>, 774 F.2d at 1328). Mosley argues the Defendants had a duty to intervene because they created the danger and were in a better position to remedy the danger. (Doc. 55 at 13-14.) Mosley notes that the crew member led Norris and him to the area and had the flashlight. (<u>Id.</u>) In reply, Defendants argue that Mosley's reliance on <u>Roach</u> is incomplete because he does not address whether Defendants had actual knowledge that the stevedore was exercising "obviously improvident" judgment. (Doc. 59 at 7.) The Court agrees.

Applying the Fifth Circuit factors, while this was an area of the ship that allegedly lacked adequate lighting, statutes and regulations place the duty to provide lighting on the stevedore, <u>Chapman</u>, 936 F. Supp. at 986, and Defendants did not affirmatively remove lighting. Also, Mosley notes that it was "pitch black" upon arriving on the third level of the lashing bridge, indicating that the hazard was known to him. (Doc. 53, Attach. 1 at 11.)

Moreover, even assuming the crew member's knowledge of the condition can be imputed to Defendants, <u>Fontenot</u>, 227 F. App'x at 405, Defendants are correct that further inquiry is required to establish a breach of the duty to intervene. First, Defendants must have had knowledge the inadequate lighting was dangerous. <u>See</u> <u>Green</u>, 418 F. App'x at 869. Second, Defendants must have had knowledge of the stevedore's exercise of "obviously improvident"

judgment in failing to remedy the lighting issue. Miller, 685 F. App'x at 757.

Mosley has not alleged that he or Norris complained to the crew member about the lighting level. (Doc. 53, Attach. 1 at 28; Doc. 45 at ¶ 13; Doc. 56 at ¶ 13.) Both Mosley and Norris checked the lashings on one side of the bridge. (Doc. 45 at ¶¶ 6, 8; Doc. 56 at ¶¶ 6, 8.) Yet, despite problems with the lighting level, Mosley decided, on his own accord, to check the other side by himself without the crew member's flashlight and without protesting about the lighting level. (Doc. 53, Attach. 1 at 7; Doc. 44, Attach. 3 at 8, 9.) Mosley's decision to continue to check the lashings without complaint undermines a finding that the lighting was so dangerous that the crew member knew the condition created an unreasonable risk of harm. Casaceli, 774 F.2d at 1330-31 (concluding vessel owner's knowledge of muddy water, entangled propellers, and air supply complaints failed to establish knowledge that the condition was dangerous considering the fact that expert diver continued to make subsequent dives). The fact that Mosley did not complain to the crew member also contravenes a conclusion that Defendants had actual knowledge the stevedore was exercising "obviously improvident judgment" by failing to provide additional lighting such that Defendants were required to

intervene.[12] <u>Miller</u>, 2016 WL 1322439, at *5 (noting neither stevedore, plaintiff, nor any other longshoreman complained about alleged hazard when concluding stevedore's decision was not obviously improvident); <u>see also</u> <u>Harris</u>, 967 F. Supp. at 165 (noting neither stevedore nor longshoreman complained of alleged lighting inadequacies). Accordingly, Defendants are entitled to summary judgment with respect to Mosley's claim based on a breach of the duty to intervene.

<strong>CONCLUSION</strong>

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 43) is **GRANTED**, and Mosley's complaint is **DISMISSED**. Furthermore, the Court's determination renders moot Ceres' subrogation claim seeking to recover the amount of LHWCA workers'

---

[12] The Fourth Circuit's decision in <u>Hodges</u> does not demand different result. 801 F.2d at 683-84. As explained above, in <u>Chapman</u>, a court in this District distinguished <u>Hodges</u> based on the active control duty, not the duty to intervene. 936 F. Supp. at 987. In any event, as Mosley acknowledges, the Fourth Circuit first determined a duty could be imposed before turning to concepts of general negligence to determine if there was sufficient evidence of a breach of the duty. (Doc. 55 at 14 ("Having concluded that the jury could find a duty of intervention . . . "); <u>Hodges</u>, 801 F.2d at 684. Here, for the reasons already explained, the active control duty was not triggered, and Defendants did not owe a duty to intervene.

compensation benefits it has paid to Mosley from any recovery obtained by Mosley against Defendants. Accordingly, Ceres' third party complaint (Doc. 23) is **DISMISSED**. The Clerk of Court is **DIRECTED** to close this case.

SO ORDERED this _1ST_ day of November 2021.

WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA